```
            IN THE UNITED STATES DISTRICT COURT
             FOR THE SOUTHERN DISTRICT OF OHIO
                      EASTERN DIVISION
```

Jennifer L. Rouse,                :

      Plaintiff,           :

  v.                              :        Case No. 2:16-cv-0223

                                                        JUDGE ALGENON L. MARBLEY
Commissioner of Social           :        Magistrate Judge Kemp
Security,

      Defendant.           :

                    REPORT AND RECOMMENDATION

        I.  Introduction

    Plaintiff, Jennifer L. Rouse, filed this action seeking review of a decision of the Commissioner of Social Security denying her applications for disability insurance benefits and supplemental security income.  Those applications were filed on April 4, 2012, and alleged that Plaintiff became disabled on December 18, 1998.

    After initial administrative denials of her claim, Plaintiff was given a hearing before an Administrative Law Judge on May 14, 2014.  In a decision dated September 26, 2014, the ALJ denied benefits.  That became the Commissioner's final decision on January 14, 2016, when the Appeals Council denied review.

    After Plaintiff filed this case, the Commissioner filed the administrative record on May 11, 2016.  Plaintiff filed a statement of errors on June 24, 2016, to which the Commissioner responded on October 12, 2016.  Plaintiff filed a reply brief on October 26, 2016, and the case is now ready to decide.

    II.  Plaintiff's Testimony at the Administrative Hearing

    Plaintiff, who was 36 years old as of the date of the hearing and who has a ninth grade education, testified as follows.  Her testimony appears at pages 35-49 of the

administrative record.

Plaintiff was first asked about her work history. She said she had not worked in 2009 even though her earnings record showed some self-employment income that year, and the topic was dropped after the ALJ noted that she had no past relevant work for social security purposes.

Next, Plaintiff was asked what conditions prevented her from working. She said that she was in constant pain from her neck down to her back. She had surgery in 2013 for a crushed tailbone, but no other surgical treatment. Plaintiff was getting injections in her back, however. She thought she could sit for fifteen minutes to half an hour, stand for about the same period of time, and walk half a block. She could lift a gallon of milk. Additionally, she wore a TENS unit and a wrist brace every day.

Plaintiff further testified that she lived in a house with one other person. The house had stairs but she did not use them often. She did no household chores other than sweeping out a small bathroom and starting some meals. She had numbness in her right (dominant) hand which affected her ability to complete chores. Plaintiff did not sleep well due to pain, but she tried not to nap during the day. She used a heating pad on a regular basis and usually sat in a recliner.

Counsel also asked Plaintiff about migraine headaches. She said she had them almost daily and that they could last for more than a day. She had been seeing a counselor for bipolar disorder as well. Plaintiff described issues relating to other people and said she did not have friends to socialize with. She also used an inhaler for breathing problems (something she had done her entire life), and the medication she took for migraines made her sick.

### III. The Medical Records

The pertinent medical records are found beginning at page

320 of the administrative record.  Since Plaintiff's statement of errors focuses only on Plaintiff's mental impairments, the Court's summary of the evidence will do the same.

Plaintiff was seen at Jefferson Behavioral Health on June 20, 2012 for an intake interview.  Her diagnoses at that time included Bipolar I disorder, chronic PTSD, and personality disorder.  Her current GAF was rated at 50, down from a past GAF of 55.  Treatment goals were stated as "to decrease anger and depression - to stabilize mood."  She complained of anger, depression, and racing thoughts.  Her mood was depressed and anxious and she had impaired concentration and memory.  She began seeing a counselor at that agency.  (Tr. 457-68).

David Bousquet, M.Ed., performed a consultative psychological evaluation on July 24, 2012.  Plaintiff said that she had lost jobs in the past due to absenteeism, which she attributed to mental health issues.  She had been in counseling for most of her life but had been in treatment at Jefferson Behavioral for only a month and had yet to see the psychiatrist.  She was not currently on medication.  Her symptoms included lack of appetite, difficulty sleeping, nightmares, tearfulness, low energy, and moodiness.  Her daily activities included cleaning, cooking, doing laundry, taking care of animals, watching television, and cooking.  Her mood was depressed and anxious at times and she reported hearing voices.  Mr. Bousquet reached the same diagnoses as Jefferson Behavioral Health had done, rated her overall GAF at 45 (although her functional GAF was 55), and said that her self-reported data appeared reliable.  He thought she would have the ability to understand and carry out basic work instructions but would have difficulties with maintaining concentration, attention, persistence, and pace in a work setting, difficulties in conforming to social expectations in a work setting, and trouble coping with work stress.  (Tr. 470-78).

Plaintiff's family doctor referred her to Neurobehavioral Medicine Consultants in St. Clairsville for an evaluation, which was conducted on January 9, 2013. The report from a certified nurse practitioner indicated that Plaintiff reported anxiety, irritability, and depression. She had recently become more distracted and had anger issues as well. Plaintiff presented as downcast and glum but her memory appeared intact. Her GAF was rated at 45 and she was counseled and given medication. A referral for further counseling was also made. (Tr. 553-55). When next seen, Plaintiff had been taking Abilify and reported improvement in her symptoms. (Tr. 557-58). Progress notes from April and May, 2013 showed that in April, Plaintiff's symptoms had worsened and that she appeared minimally communicative, tense, anxious, and unhappy, but by May her symptoms were slightly improved. Her domestic skills were described as "intact and unimpaired" and her family relations were normal. However, her GAF score remained at 45. (Tr. 566-71). She apparently discontinued treatment with that provider and went back to Jefferson Behavioral Health on July 31, 2013 after voluntarily discontinuing her medication. She reported essentially the same symptoms as before and her GAF was rated at between 50 and 55. It appears that she did not follow that assessment up with any actual treatment. (Tr. 683-97).

Finally, the records were reviewed by two state agency psychologists. The first, Dr. Finnerty, concluded that Plaintiff had moderate limitations in the areas of maintaining attention and concentration, completing a workday or work week without interruption from psychologically-based symptoms, interacting with others, and responding appropriately to changes in the work setting. He thought, however, that she could adapt to a static setting without frequent changes, could work with others on an infrequent and superficial basis, and could sustain simple

-4-

repetitive tasks without fast pace. (Tr. 61-63). Great weight was given to Mr. Bousquet's evaluation at that stage of the process. (Tr. 74). The subsequent reviewer, Dr. Goldsmith, did not change any of Dr. Finnerty's findings, noting that Plaintiff's symptoms had improved with recent treatment. (Tr. 94-96). Both opinions were rendered before the April and May treatment notes from Neurobehavioral Medicine Consultants were made.

### IV. The Vocational Evidence

No vocational expert testified at the administrative hearing, but interrogatories were sent to a vocational expert, Dr. Ostrowski. He was given a single hypothetical question to answer which described a person with the residual functional capacity which the ALJ attributed to Plaintiff in the administrative decision (see Section V below). In response, he identified the jobs of document preparer, ampule sealer, and surveillance system monitor - all unskilled positions - that such a person could do. He also said that his answers did not conflict with the Dictionary of Occupational Titles. (Tr. 311-13).

### V. The Administrative Law Judge's Decision

The Administrative Law Judge's decision appears at pages 8-23 of the administrative record. The important findings in that decision are as follows.

The Administrative Law Judge found, first, that Plaintiff met the insured status requirements of the Social Security Act through March 31, 2008. Second, he found that Plaintiff had not engaged in substantial gainful activity since her alleged onset date. Going to the next step of the sequential evaluation process, the ALJ concluded that Plaintiff had severe impairments including degenerative disc disease at L4-S1 with spondylotic spondylolisthesis and left radiculopathy, status post laminectomy

-5-

and fusion; sciatica; cervical/thoracic/lumbar sprain/sprain; intermittent cephalgia/migraine headaches/low pressure headaches; mood disorder; bipolar disorder; diagnosis of major depressive disorder; posttraumatic stress disorder; and diagnosis of a personality disorder.  The ALJ also found that these impairments did not, at any time, meet or equal the requirements of any section of the Listing of Impairments (20 C.F.R. Part 404, Subpart P, Appendix 1).

Moving to the next step of the sequential evaluation process, the ALJ found that Plaintiff could work at the sedentary exertional level with a sit/stand option that permitted her to change positions every thirty minutes without breaking task.  She could do only minimal squatting and could not climb ladders, ropes, or scaffolds, and could not be exposed to temperature extremes or wet or humid conditions.  She could not be exposed to workplace hazards and needed to work in a low stress environment with no production line or assembly line type of pace, no independent decision-making responsibilities, and minimal changes in the daily work routine.  Finally, she could do only unskilled work involving only routine and repetitive instructions and should have no interaction with the general public and no more than occasional interaction with co-workers and supervisors.

With these restrictions, the ALJ concluded that Plaintiff, although she had no past relevant work, could work as a document preparer, ampule sealer, or surveillance system monitor.  He also found that those jobs existed in significant numbers in the national economy.  Consequently, the ALJ decided that Plaintiff was not entitled to benefits.

### VI.  Plaintiff's Statement of Errors

In her statement of errors, Plaintiff raises these issues: (1) the ALJ's formulation of Plaintiff's mental residual functional capacity was not supported by substantial evidence;

and (2) the ALJ's findings at step two of the sequential evaluation process (severe impairments) were impermissibly vague, rendering the ALJ's decision essentially unreviewable. These issues are considered under the following legal standard.

    <u>Standard of Review.</u> Under the provisions of 42 U.S.C. Section 405(g), "[t]he findings of the Secretary [now the Commissioner] as to any fact, if supported by substantial evidence, shall be conclusive. . . ." Substantial evidence is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion'" <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971) (quoting <u>Consolidated Edison Company v. NLRB</u>, 305 U.S. 197, 229 (1938)). It is "'more than a mere scintilla.'" <u>Id</u>. <u>LeMaster v. Weinberger</u>, 533 F.2d 337, 339 (6th Cir. 1976). The Commissioner's findings of fact must be based upon the record as a whole. <u>Harris v. Heckler</u>, 756 F.2d 431, 435 (6th Cir. 1985); <u>Houston v. Secretary</u>, 736 F.2d 365, 366 (6th Cir. 1984); <u>Fraley v. Secretary</u>, 733 F.2d 437, 439-440 (6th Cir. 1984). In determining whether the Commissioner's decision is supported by substantial evidence, the Court must "'take into account whatever in the record fairly detracts from its weight.'" <u>Beavers v. Secretary of Health, Education and Welfare</u>, 577 F.2d 383, 387 (6th Cir. 1978) (quoting <u>Universal Camera Corp. v. NLRB</u>, 340 U.S. 474, 488 (1951)); <u>Wages v. Secretary of Health and Human Services</u>, 755 F.2d 495, 497 (6th Cir. 1985). Even if this Court would reach contrary conclusions of fact, the Commissioner's decision must be affirmed so long as that determination is supported by substantial evidence. <u>Kinsella v. Schweiker</u>, 708 F.2d 1058, 1059 (6th Cir. 1983).

                        A.   <u>The Step Two Findings</u>

    If Plaintiff is correct that the ALJ made an error at step two and that a remand on that basis is required, it will not be necessary to determine whether the ALJ's mental residual

functional capacity finding is supported by substantial evidence. Therefore the Court will address this issue first.

This argument focuses on the ALJ's discussion of severe, non-severe, and non-medically determinable impairments. The parties both agree that placing an impairment into one of these three categories has implications for the administrative decision-making process. Obviously, if an impairment is deemed to be severe, the limitations arising from that impairment must be factored into the ALJ's residual functional capacity finding. The same is true, however, for non-severe impairments. 20 C.F.R. §404.1523 states that the ALJ must "consider the combined effect of all of [a claimant's] impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity." See also Simpson v. Comm'r of Social Security, 344 Fed.Appx. 181, 190-91 (6th Cir. Aug. 27, 2009). On the other hand, a claimed condition which is not "medically determinable" need not be considered at all. As stated in 20 C.F.R. §404.1527(a), an ALJ is only required to consider impairments which "result from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." The mere statement of symptoms by a claimant cannot establish the existence of a medically determinable impairment. 20 C.F.R. §404.1508.

Here, in his step two analysis, the ALJ made the statement that "all other impairments other than those enumerated above, alleged and found in the record, are non-severe or not medically determinable as they have been responsive to treatment, cause no more than minimally vocationally relevant limitations, have not lasted or are not expected to last at a 'severe' level for a continuous period of 12 months or expected to result in death, or have not been properly diagnosed by an acceptable medical source

...."  (Tr. 11).  The ALJ then listed the conditions subject to this analysis, including optic nerve edema, idiopathic in-cranial hypertension, headache/possible seizure type activity, incidental Chiari I malformation, abnormal uterine bleeding, asthma/upper respiratory infections, remote diagnosis of pathological grief, remote diagnosis of cannabis abuse, thoracolumbar neuritis/radiculitis, myofasciitis/myositis/myofibrosis, possible mild bilateral carpal tunnel syndrome, and possible peripheral neuropathy, concluding that they were "considered not medically determinable/not severe for purposes of this decision...."  Id. Plaintiff argues that because it is not possible to determine which of these impairments the ALJ placed in each category, it is also impossible to know if he properly considered the non-severe impairments - whichever ones those were - in arriving at his residual functional capacity determination.

   Although acknowledging that it can, in some cases, make a difference whether any particular impairment is categorized as non-severe or not medically determinable, the Commissioner argues that it did not do so here.  Making what amounts to a harmless error argument, the Commissioner notes that "Plaintiff has not indicated in any way how any of the impairments that the ALJ did not list as severe affected her functioning in any way" and "has not shown how any of these impairments ... would have limited her ability to do the work described in her RFC."  Doc. 15, at 9.  In her reply, Plaintiff essentially repeats her argument that the ALJ erred, but does not identify any limitations which might have arisen from any of these conditions, no matter how they were categorized, which should have been factored into the residual functional capacity analysis.

   If the ALJ had resolved this issue in Plaintiff's favor by finding that all of the impairments he listed were medically determinable but non-severe - which is the best result Plaintiff could hope for were the case to be remanded - the key question

-9-

would then be "whether the ALJ's decision not to find any limitations arising from the condition in question is supported by substantial evidence." See Rose v. Comm'r of Social Security, 2015 WL 6735313, *5 (S.D. Ohio Nov. 4, 2015), adopted and affirmed 2015 WL 7779300 (S.D. Ohio Dec. 2, 2015).  Where, as here, Plaintiff identifies no such limitations, and it is not apparent that any exist, the error made by the ALJ is harmless. It would certainly be better practice were an ALJ to say explicitly which impairments are found to be non-severe and which are found not to be medically determinable, but ordering a remand for clarification of that question when the ALJ's residual functional capacity finding would not change would be an exercise in futility.  Consequently, the Court finds that, while error occurred here, it does not justify a remand.

B.  Mental Residual Functional Capacity

Plaintiff's other argument is that the ALJ did not properly determine her mental residual functional capacity.  The bulk of her argument is directed to the ALJ's decision to give no weight to the assessment done by David Bousquet, the consultative examiner.  The Commissioner concedes that the ALJ also made errors in evaluating Mr. Bousquet's report, but argues that these errors did not ultimately affect the residual functional capacity finding and that the ALJ's decision on this issue is supported by substantial evidence.

There is no treating source opinion here, so the ALJ was tasked with reconciling the differences in the three opinions he had - one from Mr. Bousquet and two from the state agency reviewers - and deciding on a residual functional capacity finding based on those opinions and the treatment records.  As noted above, the treatment records are sparse, showing that Plaintiff attended less than half a dozen counseling sessions in total after her June, 2012 intake interview with Jefferson Behavioral Health.  Those records are fairly consistent in terms

of Plaintiff's reported symptoms, but they do show periodic improvement as well as periodic lapses into more serious symptoms.  The ALJ described them as showing sporadic treatment which appeared to be successful when Plaintiff complied with recommendations, and that is a fair reading of the record.  Plaintiff's main issue, though, is with how the ALJ discounted Mr. Bousquet's report.

   The ALJ did not appear to recognize that Mr. Bousquet assigned Plaintiff an overall GAF of 45, citing instead the functional GAF score of 55.  He gave Mr. Bousquet's opinions as to functional capacity "no weight" for several reasons: the heavy reliance on Plaintiff's report of symptoms, the lack of corroboration in treatment notes, the fact that she was not taking medications at the time of the evaluation, the "vague" nature of the opinions, and the weight given to the state agency reviewers' opinions, who clearly concluded that Plaintiff could function in a work environment that had specific restrictions.

   The ALJ did misstate the GAF score and to some extent relied on that misstatement, saying that the score suggested only moderate limitations (and, implicitly, that to the extent that Mr. Bousquet found more serious limitations, his report was internally inconsistent).  However, the ALJ said elsewhere in his decision that he placed very little weight on GAF scores, so it does not appear likely that this issue had much effect on his decision about Mr. Bousquet's opinion.  Plaintiff makes a cogent argument that it is somewhat inconsistent for an ALJ to discount a consultative examiner's opinion because it is not specific as to limitations when the Social Security Administration itself discourages such specificity, but, on the other hand, as the Commissioner points out, the state agency psychologists apparently had little trouble interpreting Mr. Bousquet's opinions as to functionality, giving his report great weight and finding that it supported various limitations on Plaintiff's

-11-

ability to function in the workplace.  The ALJ's reliance on those opinions cured any problem with his critique of the specificity of Mr. Bousquet's report.  Finally, the ALJ was correct that the treatment history was sporadic and showed that when Plaintiff actually followed through with either counseling or medication, she got better.  He also discounted the credibility of her testimony to some extent - a finding that is not contested here - and that permitted him to give somewhat less weight to a report that was based at least in part on self-reported symptoms (although almost all psychological reports rely to some extent on the claimant's report of symptoms, and that cannot serve as the only basis for discounting such a report).  Taking all of these factors into account, and considering that the ALJ was permitted to give less deference to Mr. Bousquet's opinion that an opinion from a treating source, see, e.g., Jones v. Comm'r of Social Security, 336 F.3d 469, 477 (6th Cir. 2003), the Court cannot find reversible error in the ALJ's decision to craft a mental residual functional capacity more in keeping with the opinions of the state agency reviewers.  Consequently, this statement of error also does not support a remand.

## VII.  Recommended Decision

Based on the above discussion, it is recommended that the Plaintiff's statement of errors be overruled and that judgment be entered in favor of the Commissioner.

## VIII.  Procedure on Objections

If any party objects to this Report and Recommendation, that party may, within fourteen (14) days of the date of this Report, file and serve on all parties written objections to those specific proposed findings or recommendations to which objection is made, together with supporting authority for the objection(s).  A judge of this Court shall make a de novo determination of those portions  of the report or specified proposed findings or recommendations to which objection is made.  Upon proper

objections, a judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the magistrate judge with instructions.  28 U.S.C. §636(b)(1).

The parties are specifically advised that failure to object to the Report and Recommendation will result in a waiver of the right to have the district judge review the Report and Recommendation de novo, and also operates as a waiver of the right to appeal the decision of the District Court adopting the Report and Recommendation.  See Thomas v. Arn, 474 U.S. 140 (1985); United States v. Walters, 638 F.2d 947 (6th Cir. 1981).

/s/ Terence P. Kemp
United States Magistrate Judge